ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

NOV 1 9 2012

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SCJ

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : : : | |
| **Plaintiff** | : : | |
| vs. | : : : | **Civil Action File No.** |
| BILLY WAYNE McCLINTOCK, individually, and dba MSC Holdings, DIANNE ALEXANDER aka LINDA DIANNE ALEXANDER, | : : : : : | **1:12-CV-4028** |
| **Defendants,** | : : : : | **JURY TRIAL DEMANDED** |
| MSC HOLDINGS USA, LLC, MSC HOLDINGS, INC., MSC GA HOLDINGS, LLC, | : : : | |
| **Relief Defendants.** | : | |

## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff, Securities and Exchange Commission (the "Commission"), files its

complaint and alleges that:

## OVERVIEW

1.     This matter involves an on-going "prime bank" scheme (a brand of Ponzi scheme), promising annual returns of 38 percent to be generated by a purported clandestine, highly exclusive organization in Europe known only as "the Trust."

2.     The defendants told hundreds of investors that the Trust was created after World War II by a group of extremely wealthy families, that the Trust owns European banks, and that it has the power to create money through fractional banking and the sale of bank debentures.  But, according to the defendants,  access to the Trust is open only to close friends and family members of current investors, and is subject to strict secrecy rules, violation of which results in banishment from further investment in the Trust.

3.     .From at least 2004, Defendants Billy Wayne McClintock ("McClintock") and Dianne Alexander ("Alexander") collected more than $15 million from over 220 investors in more than 20 states, including Georgia, by repeating the lies set forth above, and others.

4.     The Trust, on which the whole venture depends, does not exist.  The defendants used fund raised to make payments to themselves, to pay sums owed to earlier investors and for other undisclosed purposes.

5.   Alexander especially resorted to an appeal to Christian faith when pitching

the investment, calling the old adage "If it sounds too good to be true, it probably

is," "A lie that came from the pit of hell," and saying, "Put your money in the Trust

and your trust in God."

6.   Although the defendants called their transaction with investors "loans," each

transaction was the sale of a "security" as defined in federal securities law, and

defendants were acting as "brokers" as defined in those laws.

7.   Defendants did not register with the Commission as brokers, and did not

register the securities with the Commission before offering them.

8.   The defendants sold the supposed loans through a host of bold

misrepresentations and material omissions about the fictitious Trust.

9.   McClintock, a Florida resident and convicted felon, claimed to be the United

States Director of the Trust.

10.   Alexander, a former Georgia resident, claimed to be a United States

Regional Director for the Trust.

11.   McClintock and Alexander led investors to believe they could loan money to

the Trust and receive 38% interest annually on their investment, provided that they

abide by the Trust's strict secrecy rules.

12.    McClintock and Alexander have conducted, and continue to conduct, a

fraudulent scheme, making material misrepresentations and omissions of fact to

investors concerning, among other things, the expected returns, the use of investor

funds, and the investment risks.

13.    Unless restrained by this Court, the defendants will continue with their scam.

## **VIOLATIONS**

14.    Defendants have engaged and, unless restrained and enjoined by this Court,

will continue to engage in acts and practices that constitute and will constitute

violations of Sections 5(a), 5(c ), and 17(a) of the Securities Act of 1933

("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c) and 77q(a)] and Section 10(b)

and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§

78j(b) and 78o(a)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. §

240.10b-5 (a), (b), & (c)].

15.    Additionally, defendants have aided and abetted and, unless restrained and

enjoined by this Court, will continue to aid and abet violations of Section 17(a) of

the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15

U.S.C.  § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

16.     The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§78u(d) and 78u(e)] to enjoin defendants from engaging in the transactions, acts, practices, and courses of business alleged in this complaint, and transactions, acts, practices, and courses of business of similar purport and object.

17.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

18.     Defendants, directly and indirectly, made use of the mails, and the means instruments of transportation and communication in interstate commerce and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

19.     Certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act and the Exchange Act occurred in the Northern District of Georgia.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

20.     Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

### The Defendants

21.     Billy Wayne McClintock, individually and d/b/a MSC Holdings, age 70, is a resident of Bradenton, Florida. He was convicted of cocaine trafficking in 1989, and served time in prison in Kentucky. On information and belief, McClintock has never been registered as or associated with a broker. He claims to have earned a living as a gospel singer.

22.     Dianne Alexander a/k/a Linda Dianne Alexander, age 70, was a resident of Cumming, Georgia at the time of much of the misconduct at issue. She currently resides in Carlsbad, California. On information and belief, Alexander has never been registered as or associated with a broker.

### Relief Defendants

23.     MSC Holdings USA, LLC ("MSC USA") was created in Florida as a limited liability company on November 12, 2009. On September 24, 2010, MSC

USA was administratively dissolved. McClintock owned and controlled MSC USA.

24. MSC Holdings, Inc. ("MSC Inc.") is the name of an apparent corporation controlled by McClintock. The Commission has found no evidence of the company's actual incorporation. But, that company has held bank accounts used to collect and disburse investor funds.

25. MSC GA Holdings, LLC ("MSC GA") was incorporated in Georgia as a limited liability company on October 3, 2007. On September 5, 2012, MSC GA was administratively dissolved. Alexander owned and controlled MSC GA.

## THE PRIME BANK SCHEME

26. By the late 1990s, Defendants McClintock and Alexander had been friends for many years.

27. At some point before 2002, McClintock told Alexander about his investment in an entity that he called the Trust.

28. McClintock told Alexander the following about the Trust and how he came to be associated with it:

7

a.      In the 1990's, while McClintock was on a business trip in London, he met a man named "John" who was an officer of the Trust.

b.      Because of McClintock's relationship with John, McClintock became aware of an opportunity to lend money to the Trust and receive at least 38% annual interest.

c.      The Trust was started after World War II and is comprised of several extremely wealthy European families. The Trust is headquartered in London and has offices in Luxembourg and Zurich.

d.      The Trust owns banks in Europe.  The Trust has the power to create money through fractional banking and the sale of banking debentures. The Trust funds humanitarian projects around the world.

e.      Details about the Trust are very secretive and cannot be discussed openly by other investors in public.

f.      The opportunity to invest in the Trust is only available due to McClintock's personal relationship with the Trust and the

opportunity can only be offered by other investors to their family and close friends.

g.      Investors can loan money to the Trust through renewable contracts of one year and one day, and earn interest of 38 percent per year.

h.      Investors are required to pay the minimum investment amount. This minimum amount varied, and typically was $35,000 or $50,000 for most investors.

i.      Any investor who speaks about the details of the Trust to anyone who is not family or a close friend (except with permission from McClintock and/or Alexander) would be banned from further participation in the Trust.

j.      Any investor who reveals anything about the Trust to an attorney, certified public accountant, or financial planner would be banned from further participation in the Trust.

k.      Any investor who decides not to renew his or her loan and instead requests a return of principal will be banned from further participation in the Trust.

> l.     If an investor's referral to the Trust breaks one of the Trust's
>
> rules, then both the referring investor and the referral will be banned
>
> from further participation in the Trust.

29.    Alexander not only invested, but also accepted McClintock's offer to be a United States Regional Director for the Trust.

30.    According to Alexander, there are three additional Regional Directors, but she claims not to know them.

31.    McClintock is the purported United States National Director for the Trust.

32.    Both individually and together, McClintock and Alexander have been telling the story outlined in paragraph 28 above to prospective investors since at least 2004.

33.    Embellishments to the central representations varied— in one version the U.S. Department of Homeland Security is the largest borrower from the Trust— but the central misrepresentations of the scheme stay the same.

34.    Apparently attempting to avoid scrutiny by federal securities enforcers, McClintock told Alexander not to refer to investor payments as an "investment," but rather as a "loan," and that she should never refer to those whose money she took as "investors," but rather as "Trust lenders."

35.   As Regional Director, Alexander was responsible for "managing" loans from investors in 10 states.

36.   She received, from McClintock, management fees of five percent of the principal amount invested by any persons she referred to the Trust, when the investor loan "matured" (*i.e.,* after one year).

37.   If an investor rolled over his or her principal into a new contract, she received another five percent fee.

38.   If one of her downline investors referred a new investor to the Trust, she received a five percent fee and the referring investor received a five percent fee.

39.   McClintock and Alexander signed and delivered to investors various forms of a one-page written contract evidencing the investors' initial investments and any rollovers of their investments into new contracts (the "Investor Agreements").

40.   McClintock and Alexander used no other documents in this scam.

41.   Neither Alexander nor McClintock asked prospective investor about their personal financial condition or the source of their invested funds or took any steps to qualify them as accredited investors.

42.     The Investor Agreements did not mention the Trust. Instead, McClintock

and Alexander orally provided information about the Trust to investors.

43.     Although Alexander made the representations to most of the investors,

McClintock was present for at least one meeting at which Alexander spoke to a

prospective investor about the Trust.

44.     In her role as purported Regional Director, Alexander hosted at least one

social gathering of "Trust Lenders" and their guests in Georgia.

45.     At this social gathering, some investors gave testimonials regarding their

positive experiences in getting paid by the Trust.

46.     McClintock personally entered into and signed Investor Agreements with

his downline investors, including Alexander.

47.     After Alexander became a purported Regional Director in 2004, she began

to tell others about the opportunity to invest in the Trust.

48.     According to Alexander, she told prospective investors substantially the

same information that McClintock told her and other investors before and after she

became an investor.

49.     Alexander in turn personally entered into and signed Investor Agreements

with her downline investors.

50.     None of the contracts disclosed whether fees or other payments would be made to McClintock, Alexander, or other referring investors from the invested principal, or the amount of any such payments.

51.     The contract term was for "One Year and a Day."  Most of the contracts provided that "placement" of the investor funds would automatically roll over for one year and one day unless the investor gave timely notice otherwise.

52.     If a contract rolled over, McClintock or Alexander and the investor signed another contract.

53.     From at least 2004, Investor Agreements consistently provided for expected returns of 38% interest per year.

54.     The Investor Agreements contained various statements cryptically describing loans to be managed by McClintock or Alexander, rather than stating that the loans ostensibly were being made to the Trust.

55.     McClintock signed contracts with at least 10 investors, and rolled over their contracts multiple times.  He executed contracts, including rollovers, with Alexander and other investors as late as July 2012 and possibly later.  His contracts reflect principal investments of at least $300,000.

56.     From 2004, Alexander signed contracts with at least 220 investors, and rolled over their contracts multiple times.  Her contracts reflect principal

investments of well over $15 million.  She executed contracts with other investors as late as October 2012, all or substantially all of which appear to be rollover contracts.

57.     The defendants never sent investor funds to any purported Trust, whether in Europe or otherwise.

58.     Rather, the defendants simply pooled investor funds together, transferred investor funds between their affiliated entities, made regular "interest" payments to investors, and garnered substantial payments for themselves.

59.     Alexander's investors generally made their checks payable to proposed relief defendant MSC GA, Alexander's controlled entity.

60.     Alexander then deposited the funds into one or more bank accounts in MSC GA's name.

61.     At McClintock's instruction, Alexander then sent the entire amount of the invested principal to one of McClintock's controlled bank accounts.

62.     McClintock used at least 10 bank accounts at several banks over the years.

63.     Some of those accounts were in the name of relief defendants MSC USA and MSC Inc.

64.     Alexander also delivered to McClintock the new and rollover Investor Agreements with her downline investors.  She sent regular e-mails to McClintock

14

advising him of contracts that had matured that month and notifying him of whether any investors wanted to compound their interest and renew their contract, or receive an interest payment.

65.    McClintock then caused his entities to transfer back to MSC GA, for distribution by Alexander, amounts purportedly for interest, fees, or returns of principal.  Portions of these payments were retained by Alexander.

66.    Available bank account records also show checks signed by McClintock and made payable to cash, himself, his affiliated entities, and other questionable sources.

67.    Alexander has signed an Investor Agreement showing that she has received at least $2,005,085 from the scheme thus far.

68.    McClintock and Alexander knowingly or recklessly made misrepresentations and omissions of material fact to investors and prospective investors about the purported investments in the Trust.

69.    Among other things, McClintock and Alexander represented, directly and indirectly, that the investor funds would be used for lucrative banking or other operations by the Trust, when in fact the Trust does not exist and in any event McClintock does not appear to have transferred substantial investor funds to the purported Trust.

70.    The proposed defendants failed to disclose to investors and prospective

investors the considerable risk of loss to their principal and purported interest of

investing in an entity that is non-existent.

71.    The Investor Agreements signed by McClintock and Alexander were false

and misleading because they led investors to expect consistent profits of 38

percent on their investment per year, when the defendants had no reasonable basis

to project those profits.

72.    Alexander recklessly relied solely on McClintock's representations about the

profits to be generated by the Trust, without taking any independent steps to either

verify the existence of the Trust or whether McClintock was in fact receiving

payments from the Trust.

73.    McClintock had no reasonable basis to project 38 percent returns,

particularly when available bank account records do not indicate that any such

returns were deposited into his controlled accounts.

74.    The representations in numerous rollover Investor Agreements summarizing

the accrued interest paid to date were also false and misleading, since no such

interest actually existed.  Instead, the Trust is a Ponzi scheme in which new

investor funds, not Trust profits, pay the purported fees and interest owed to earlier

investors.

75.   McClintock and Alexander failed adequately to disclose the existence and amount of the commissions and other payments they received to all investors and prospective investors.

76.   As part of the fraudulent scheme, the proposed relief defendants, MSC USA, MSC Inc., and MSC GA (affiliated entities of McClintock and Alexander), were used to divert funds and may still hold investor funds or other assets in bank accounts or other locations without any legitimate claim to the assets.  They did not provide value in exchange for the funds transferred to them.

### COUNT ONE – UNREGISTERED OFFERING OF SECURITIES

#### Violation of Sections 5(a) and 5(c) of the
#### Securities Act [15 U.S.C. § 77o(a) and 77o(c)

#### (McClintock and Alexander)

77.   Paragraphs 1 through 76 are hereby realleged and incorporated herein by reference.

78.   No registration statement has been filed or is in effect with the Commission pursuant to the Securities Act and no exemption from registration with respect to the transactions described herein.

79.   From at least 2004 to present, Defendants, singly and in concert, have:

(a)     made use of the mean or instruments of transportation or communication in interstate commerce of the mails to sell securities, through the use or medium of a prospectus or otherwise;

(b)     carried securities or caused such securities to be carried through the mails or in interstate commerce, by any mean or instruments of transportation, for the purpose of sale or for delivery after sale; and

(c)     made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy securities, through the use or medium of any prospectus or otherwise, without a registration statement have been filed with the Commission as to such securities.

80.     By reason of the foregoing, Defendants, directly and indirectly, singly and in concert, have violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT TWO – FRAUD
## Violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]
## (McClintock and Alexander)

81.     Paragraphs 1 through 76 are hereby re-alleged and are incorporated herein by reference.

82.     From at least 2004 to at present, Defendants, in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

83.     Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

84.     While engaging in the course of conduct described above, defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

85.     By reason of the foregoing, defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT THREE – FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3)
### of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

### (McClintock and Alexander)

86.    Paragraphs 1 through 76  are hereby realleged and are incorporated herein by reference.

87.    From at least 2004 to at present, Defendants, in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

    a.    obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    b.    engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

20

88.   By reason of the foregoing, defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

### COUNT FOUR—FRAUD

**Violations of Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)]and Rules 10b-5(a), (b), and (c)
thereunder [17 C.F.R. § 240.10b-5 (a), (b), & (c)]**

### (McClintock and Alexander)

89.   Paragraphs 1 through 76 are hereby re-alleged and are incorporated herein by reference.

90.   From at least 2004 to present, defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

   a.      employed devices, schemes, and artifices to defraud;

   b.      made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

   c.      engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities,

21

all as more particularly described above.

91.    Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

92.    By reason of the foregoing, defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), & (c)].

## COUNT FIVE—AIDING AND ABETTING FRAUD

**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]
And Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)]and Rules 10b-5(a), (b), and (c)
thereunder [17 C.F.R. § 240.10b-5 (a), (b), & (c)]**

### (McClintock and Alexander)

93.    Paragraphs 1 through 76 are hereby re-alleged and are incorporated herein by reference.

94.    From at least 2004 to present, defendants, in connection with the purchase and sale of securities described herein, by the use of the means and

22

instrumentalities of interstate commerce and by use of the mails, directly and indirectly aided and abetted each other's primary violations described in Counts two through four above:

95.     Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

96.     By reason of the foregoing, defendants, directly and indirectly, have aided and abetted and, unless enjoined, will continue to aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. 77q(a)], Section10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), & (c)].

## COUNT SIX--UNREGISTERED BROKER-DEALER

## Violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]

### (McClintock and Alexander)

97.     Paragraphs 1 through 76 are hereby restated and incorporated by reference.

98.     From at least 2004 to at least present, defendants have been using the mails and the means and instrumentalities of interstate commerce to effect transactions in, or induce or attempt to induce the purchase or sale of securities, without registering with the Commission as a broker, as more particularly described above.

99.     By reason of the foregoing, defendants have violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## COUNT SEVEN- UNJUST ENRICHMENT

### (Relief Defendants)

100.    Paragraphs 1 through 76 are hereby restated and incorporated by reference.

101.    The relief defendants have received, are receiving, and currently hold the proceeds of the violations outlined above.

102.    The relief defendants have been unjustly enriched by the receipt of investor funds.

103.    The relief defendants have no legitimate claim to the investor funds they have received and should be required to disgorge it, plus prejudgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Commission respectfully prays for:

**I.**

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that defendants named herein committed the violations alleged herein.

**II.**

A temporary restraining order, preliminary and permanent injunctions enjoining defendants, their officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a). 77e(c), and77 q(a)], and Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), & (c)].

**III.**

An order freezing the assets of the defendants and relief defendants.

**IV.**

An order requiring an accounting by defendants of the use of proceeds of the fraudulent conduct described in this Complaint and the disgorgement by defendants and relief defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

25

## V.

An order pursuant to Section 24 of the Securities Act [15 U.S.C. § 77x] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)] imposing civil penalties against defendants.

## VI.

An order providing for expedited discovery.

## VII.

An order requiring the defendants and relief defendants to repatriate funds transferred outside the United States.

## VIII.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

DATED: November 19, 2019[1]

---

[1]    Pursuant to Local Rule 7.1D, counsel for the Commission certifies that this Complaint has been prepared in 14 point Times New Roman font, which is approved by the Court in LR 5.1B.

Respectfully submitted,

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

Pat Huddleston II
Senior Trial Counsel
Georgia Bar No. 373984

Attorneys for Plaintiff
Securities and Exchange Commission
950 East Paces Ferry Road, N.E., Suite 900
Atlanta, GA 30326
Tel:(404) 842-7600